# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA        CRIMINAL ACTION

VERSUS

DELVIN J. JOSEPH        NO. 24-00041-BAJ-RLB-1

## RULING AND ORDER

Before the Court is Defendant's **Motion To Suppress (Doc. 17, the "Motion")**. In the Motion, Defendant seeks to suppress all statements Defendant made and all evidence law enforcement seized during Defendant's arrest. (*Id.* ¶ 3). The United States opposes the Motion. (Doc. 22). The Court held a hearing on the Motion. (Doc. 60; Doc. 62). Additional briefing is not necessary. For the following reasons, Defendant's Motion will be **DENIED**.

## I.    BACKGROUND

On August 3, 2023, while at the intersection of Skip Bertman Drive and Nicholason Drive in Baton Rouge, Louisiana, Officer Kelly Romero ("Officer Romero") of the Louisiana State University ("LSU") Police Department, spotted a Nissan Altima, operated by Defendant, which Officer Romero believed did not have a properly displayed license plate. (Doc. 22 at 1). Defendant disputes that his license plate was improperly displayed and notes that he had a temporary license plate displayed on the left corner of the vehicle's rear window. (Doc. 17-1 at 1).

Officer Romero drove through the intersection and followed Defendant's car. (Doc. 22 at 1–2). While following Defendant's car, Officer Romero could not see a

license plate number either on the back glass or in the vehicle's rear display bracket. (*Id.* at 2). Instead, Officer Romero observed a "J.S. Auto LLC" advertisement plate hanging by one screw on the rear-display bracket. (*Id.*). Officer Romero testified that trees shading Nicholson Drive made it difficult for Officer Romero to see the back glass of Defendant's vehicle, and the headlights of Officer Romero's vehicle were low to the ground, such that they did not illuminate the back glass of Defendant's Nissan Altima. (Doc. 62 at 32:5–23). Officer Romero further testified that he did not use the high beam setting of his headlights or a separate spotlight to get a better view of the back glass of Defendant's vehicle because it could create a safety issue by blinding the driver. (*Id.* at 63:14–64:8).

Another officer later present on scene after Officer Romero initiated the traffic stop, Police Officer Shane Landerman ("Officer Landerman"), testified that all police units have a separate mounted spotlight that is commonly used to view both the exterior and interior of a vehicle before an officer conducts a traffic stop. (*Id.* at 86:23 – 87:14, 93:6 – 18). Officer Landerman also testified that the trees on Nicholson Drive were not overgrown so as to obstruct his ability to view the street or other cars. (*Id.* at 93:6–94:5).

Just north of the intersection of North Stadium Drive and Nicholson Drive, Officer Romero activated the emergency lights on his police vehicle to effectuate his stop of Defendant. (*Id.*). Defendant proceeded north on Nicholson Drive until he pulled into a driveway in front of the LSU Natatorium Parking Lot. (*Id.*).

Officer Romero did not initially activate his body-worn camera. (Doc. 17-1 at 1; Doc. 22 at 2 n.4). At approximately 8:51 p.m., after Officer Romero emerged from his vehicle and approached Defendant's car, he observed a temporary tag attached to the back glass of Defendant's car. (Doc. 17-1 at 1; Doc. 22 at 2; Doc. 62 at 23:9–24). However, Officer Romero testified that the temporary tag was folded and crumpled, making it difficult to see from the outside. (Doc. 22 at 2; Doc. 62 at 23:9–24). Officer Romero testified that he could not see the temporary tag until he got out of his police vehicle and walked toward Defendant's car. (Doc. 62 at 21:25–22:11). However, Officer Landerman testified that after he arrived on scene, he observed that the temporary tag was displayed properly and was not folded or crumpled. (*Id.* at 86:9–21).

Officer Romero further testified that although the plate was affixed to the back window of the car, it was not properly displayed in accordance with Louisiana state law because it could not be clearly read from behind. (*Id.* at 50:10–19). Officer Romero continued to approach Defendant's car because he intended to cite Defendant for the temporary plate display violation. (*Id.*). As Officer Romero approached the driver side front window of Defendant's car, he immediately detected the odor of marijuana emanating from Defendant's car. (Doc. 22 at 2; Doc. 62 at 23:25–24:7). Officer Romero could not smell the marijuana from the spot at which he first saw the temporary plate, but upon taking two or three steps toward the driver-side door, he detected a strong odor of marijuana emanating from Defendant's vehicle. (Doc. 62 at 67:15–

3

69:4). Upon reaching the driver side, Officer Romero saw a plastic bag on the center console which he suspected to contain marijuana. (Doc. 22 at 2).

Officer Romero asked Defendant for his driver license. (*Id.*). Defendant informed Officer Romero that he does not have a driver license and instead gave Officer Romero a Louisiana Identification Card. (*Id.*). Officer Romero asked Defendant and his passenger, Clea Fairley, if they had marijuana in the car or if they had been smoking marijuana. (Doc. 17-1 at 1; Doc. 22 at 2). Defendant told Officer Romero that they had both been smoking earlier. (Doc. 22 at 2).

Officer Romero then asked Defendant to step out of the car, and Defendant complied. (*Id.*). Once out of the car, Officer Romero patted down Defendant and found a bag of marijuana in one of the front pockets of Defendant's clothing. (*Id.*). Officer Romero then advised Defendant of his *Miranda* rights. (Doc. 22 at 2).

After Mirandizing Defendant, Officer Romero asked him whether he understood those rights and if Defendant wished to make any statements. (*Id.*). Defendant told Officer Romero that he understood his *Miranda* rights and said that he was willing to make a statement. (*Id.*). Defendant told Officer Romero that the marijuana in his pocket was not all the marijuana that he then possessed. (*Id.*). After telling Defendant that he would search Defendant's vehicle, Officer Romero asked Defendant what Defendant expected him to find. (*Id.* at 3). Defendant told Officer Romero that he had a firearm and a bottle of Promethazine. (*Id.*). Defendant

4

explained that, although the bottle of Promethazine did not bear a prescription label, it had nonetheless been prescribed to him. (*Id.*; Doc. 62 at 29:21–30:10).

Officer Romero waited a few minutes for two additional patrol cars to arrive before he searched Defendant's vehicle. (*Id.*). Officer Romero found the following items in Defendant's car:

- Two plastic baggies, each containing small amounts of suspected marijuana;

- A sixteen-ounce half-empty bottle containing suspected Promethazine syrup;

- A baby bottle containing approximately five fluid ounces of suspected Promethazine;

- A Glock, Model 4, Gen .45 caliber pistol which appeared to have a modified rear-slide cover plate, with an extended magazine; and

- A box containing four live rounds of .45 caliber ammunition. (*Id.*).

Officer Romero asked Defendant if the firearm had been modified, and Defendant replied that "[I]t might be." (Doc. 22 at 3).

Officer Romero then transported Defendant to the police station. (*Id.*). At some point while at headquarters, Officer Romero activated his body-worn camera. (*Id.*). From this point on, Officer Romero recorded his interactions with Defendant. (*Id.*). At 21:36:53, Defendant told Officer Romero that he had retrieved the firearm from his brother's home a few hours before the traffic stop. (*Id.*). Defendant said that he had handled the firearm before but clarified that he had never fired it. (*Id.*). At approximately 22:21:42, Defendant invoked his right to counsel. (*Id.*).

At approximately 1:07:34, Officer Romero explained to Defendant the charges against him. (*Id.* at 4). As part of this explanation, Officer Romero told Defendant that he had a "switch" on the firearm. (*Id.*). Defendant replied, "Yeah." Officer Romero then asked Defendant if he was aware the firearm had a switch, and Defendant "replied affirmatively."[1] (*Id.*).

After this, Officer Romero transported Defendant to the East Baton Rouge Parish Prison. (*Id.*). Officer Romero did not record his interactions with Defendant on his body-worn camera while inside the East Baton Rouge Parish Prison because prison policy requires officers to switch off their body-worn cameras while inside the prison. (*Id.*).

While in prison, Defendant initiated a conversation with Officer Romero in which he admitted that he knew about the switch in the pistol. (*Id.*). Defendant explained that the switch was in the pistol because he was alarmed by the number of people who carried pistols with switches, particularly because his cousin had been paralyzed during an armed robbery. (*Id.*).

Defendant was later charged with possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). (Doc. 1).

---

[1] Officer Romero did not provide testimony during the suppression hearing regarding this conversation, nor did the United States present the body-worn camera video footage capturing this interaction as evidence. The Court therefore relies on the United States' briefing, which specifies that Defendant "replied affirmatively."

## II.    LEGAL STANDARD

Federal Rule of Criminal Procedure 12 allows parties to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1).

"The Fourth Amendment guarantees '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.'" *United States v. Hunt*, 253 F.3d 227, 230 (5th Cir. 2001) (quoting U.S. Const. amend. IV). This right "extends to vehicle stops and temporary detainment of a vehicle's occupants." *United States v. Andres*, 703 F.3d 828, 832 (5th Cir. 2013). "The essential purpose of the Fourth Amendment is to impose a standard of 'reasonableness' upon law enforcement agents and other government officials in order to prevent arbitrary invasions of the privacy and security of citizens." *Hunt*, 253 F.3d at 230. The exclusionary rule provides that evidence obtained by an unreasonable search or seizure generally may not be used as evidence of guilt at trial. *United States v. Alvarez*, 40 F.4th 339, 346 (5th Cir. 2022) (citing *Mapp v. Ohio*, 367 U.S. 643, 655 (1961)).

While in general, on a motion to suppress, the defendant has the burden of proving, by a preponderance of the evidence, that the material in question was seized in violation of his constitutional rights, there are several situations where the burden shifts to the government." *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993). One such situation is when a defendant shows that he was subject to search without a

warrant. *Id.* "When the government searches or seizes a defendant without a warrant, the government bears the burden of proving, by a preponderance of the evidence, that the search or seizure was constitutional." *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001). If the Government is unable to prove the legality of the warrantless search, then the exclusionary rule requires that the evidence be suppressed. *Alvarez*, 40 F.4th at 346.

An officer may initiate a traffic stop if he possesses reasonable suspicion to believe that criminal activity is afoot. *United States v. Breeland* 53 F.3d 100, 102 (5th Cir. 1995); *See United States v. Smith*, 37 F. Supp. 3d 806, 810, 813 (M.D. La. Aug. 8, 2014) (Dick, J.) (determining that because an officer's discovery of drugs during a traffic stop did not occur while effectuating the initial purpose of the stop—in this case a license plate suspected to be obscured in violation of Louisiana state law—the evidence must be suppressed). A court must look at the totality of the circumstances to determine whether an officer possesses a particularized and objective basis to support a reasonable suspicion to believe there has been a violation of the law. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). This reasonable suspicion must be supported by specific and articulable facts. *Terry*, 392 U.S. at 21.

Overall, the "touchstone of Fourth Amendment analysis is reasonableness." *Brigham*, 382 F.3d at 507 (quoting *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)). Such an analysis takes into consideration "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Pennsylvania*

8

*v. Mimms*, 434 U.S. 106, 108–09 (1977) (citation and quotations omitted). This depends "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Id.*

The United States bears the burden of proving the existence of reasonable suspicion to support a traffic stop. *United States v. Jaquez*, 421 F.3d 338, 341 (5th Cir. 2005); *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993).

"Once an officer's suspicions have been verified or dispelled, the detention must end unless there is additional articulable, reasonable suspicion. At that point, continuation of the detention is no longer supported by the facts that justified its initiation." *United States v. Grant*, 349 F.3d 192, 196 (2003).

At the time of the incident, Louisiana state law required the following regarding temporary registration license plates:[2]

> Each temporary registration license plate shall at all times be in a clearly visible place and position. It shall be fastened to the rear of the vehicle or in the rear window of the vehicle to which it has been assigned. The temporary registration license plate shall be maintained in a condition that is clearly legible and free from foreign materials.

La. Stat. Ann. § 47:521 (2001).

---

[2] The state legislature has since amended the law to remove the ability to display a temporary plate in the rear of the window of the vehicle and has also added additional placement requirements. The amendments to the law became effective on July 1, 2025. Because the legislature did not amend the law until well after this incident, the Court will apply the law as it stood at the time of the incident. Notably, that means that at the time of the incident it was permissible to display a temporary plate in one's rear window, so long as the plate was "clearly legible and free from foreign materials." *See* La. Stat. Ann. § 47:521 (2001).

## III. DISCUSSION

Defendant argues that Officer Romero did not have the reasonable suspicion necessary to make a traffic stop at the outset of the encounter or to extend it after it began because Officer Romero's testimony regarding the temporary tag was not credible.[3] (Doc. 17-1 at 3; Doc. 62 at 116:18–117:9). Defendant emphasizes that Officer Landerman testified that the temporary plate was not folded or crumpled and was generally visible, while Officer Romero testified to the contrary. (*Id.* at 117:10–118:6).

The United States argues that Officer Landerman's testimony regarding the temporary tag does not contradict Officer Romero's testimony that Officer Romero did not observe the temporary tag until he walked towards the vehicle. (*Id.* at 118:10–119:5). The United States further contends that even if Officer Romero no longer had reasonable suspicion of a temporary plate display violation, it would nonetheless have been reasonable for Officer Romero to approach the driver-side door of Defendant's vehicle to let him know that he was free to go. (*Id.* at 119:6–122:11).

The Court acknowledges that this is a close case. Officer Landerman testified that the temporary tag was not improperly displayed while Officer Romero testified that that it was. This difference matters given that Officer Romero did not develop

---

[3] Defendant focuses his arguments on the reasonable suspicion to initiate and then extend the stop based on the temporary tag without raising any other potential Fourth Amendment suppression issues. Defendant also makes no motion regarding suppressing statements that might be protected by Defendant's *Miranda* rights. Because Defendant does not raise these issues, the Court does not address them.

an additional basis for continuing the stop until after he further approached the vehicle to issue a citation for violating La. Stat. Ann. § 47:521. Without a credible determination that Defendant violated La. Stat. Ann. § 47:521, Defendant argues, Officer Romero had no reasonable suspicion to extend the stop.

The Court disagrees with Defendant's position for two reasons. First, the Court finds Officer Romero's testimony credible. While Officer Romero and Officer Landerman had differing opinions regarding whether Defendant properly displayed the temporary tag, the Court finds that the crumpling of the license plate, however minor, was not so insignificant that the tag was obviously "clearly legible." The Court also finds Officer Romero's testimony that he could not see the temporary tag at all until he approached Defendant's vehicle on foot to be credible, especially considering that Officer Landerman provided no testimony to contract Officer Romero's observation that the tag was not visible from a moving vehicle.

Second, even if the Court were to determine that Officer Romero did not testify credibly, at the very least about his observations regarding the condition of the temporary tag once he exited his vehicle, it nonetheless would have been eminently reasonable for Officer Romero to extend the stop by a short time, if for no other reason than to notify Defendant that he was free to leave. But it was during this stage of the encounter that Officer Romero developed an additional independent basis to extend the stop, i.e., the odor of marijuana.

11

Because Officer Romero had reasonable suspicion to stop Defendant's vehicle for failing to have a properly displayed license plate, and a reasonable suspicion to extend the stop for the suspected improper temporary tag display at the time he made the additional observations, i.e., the odor of marijuana emanating from the vehicle, that led to Defendant's arrest, the Court will not suppress the evidence obtained as a result of that arrest.

IV.    CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendant's **Motion (Doc. 17)** be and is hereby **DENIED**.

Baton Rouge, Louisiana, this 5th day of November, 2025

**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**